UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

Franklin Capital Funding LLC,

    Plaintiff,

v.                                                                                  Civil Case No. 20-cv-10703

Viridis FSM Inc., *et al.*,                                            Sean F. Cox
                                                                                       United States District Court Judge
    Defendants.
_____/

## OPINION AND ORDER GRANTING IN PART PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Franklin Capital Funding, LLC ("Franklin") sued Viridis FSM Inc. ("Viridis FSM"), Viridis Foods Inc.("Viridis Foods"), Hot Box Catering, Inc.("Hot Box"), and Sean K. Randall ("Randall") (collectively "Defendants") for alleging one count of breach of note (Count I) and one count of breach of guaranty (Count II). (Am. Compl. ECF No. 1 at 5-7). Viridis FSM Inc. counterclaimed alleging one count of breach of contract. (Counter-Claim ECF No. 10 at 5-7). The matter currently before the Court is Franklin's Motion for Summary Judgment brought pursuant to Fed. R. Civ. P. 56. A zoom hearing was held on January 28, 2021. For the reasons set forth below, this Court GRANTS in part Franklin's Motion for Summary Judgment finding that Defendants are liable under the Complaint and dismissing the Counter-Complaint with prejudice.

## BACKGROUND

Franklin commenced this action in this Court on March 16, 2020. (Compl. ECF No. 1). On April 20, 2020, Viridis FSM filed a counter-complaint against Franklin. (ECF No. 10). Discovery closed on November 30, 2020. (ECF No. 22).

1

On September 30, 2020, Franklin filed this motion for summary judgment arguing that: (1) it is entitled to summary judgment as to liability on its complaint based on the terms of the parties' loan agreements; (2) Viridis FSM's counter-complaint is baseless under the plain language of the parties' loan agreements; and (3) the Court should enter judgment in favor of Franklin against Defendants, jointly and severally, because there can be no genuine issue of material fact as to damages. (Pl's Br. at i-ii).

With respect to summary judgment motions, this Court's practice guidelines, included in the Scheduling Order and provide, consistent with Fed. R. Civ. P. 56 (c) and (e), that:

> a. The moving party's papers shall include a separate document entitled Statement of Material Facts Not in Dispute. The statement shall list in separately numbered paragraphs concise statements of each undisputed material fact, supported by appropriate citations to the record. . .
>
> b. In response, the opposing party shall file a separate document entitled Counter-Statement of Disputed Facts. The counter-statement shall list in separately numbered paragraphs following the order or the movant's statement, whether each of the facts asserted by the moving party is admitted or denied and shall also be supported by appropriate citations to the record. The Counter-Statement shall also include, in a separate section, a list of each issue of material fact as to which it is contended there is a genuine issue for trial.
>
> c. All material facts as set forth in the Statement of Material Facts Not in Dispute shall be deemed admitted unless controverted in the Counter-Statement of Disputed Facts.

(Scheduling Order at 3).

The parties complied with the Court's practice guidelines for summary judgment motions such that Franklin's motion includes a "Statement of Material Facts Not In Dispute" ("Pl.'s. "Stmt.") and Plaintiff's response brief includes a "Counter-Statement of Disputed Facts" ("Def' s Stmt.").

2

Randall operated Hot Box, a corporate catering business based in Silicon Valley, California. (Randall Dec. at PageID 362). He wanted to expand his business to Nashville, Tennessee through the acquisition of a Tennessee restaurant. (Randall Dec. at PageID 362). Randall sought short term financing in order to finance the expansion of his business. (Randall Dec. at PageID 362). He created a new entity Viridis FSM to borrow $500,000 to be used by two subsidiaries Hot Box and Viridis Foods (the entity that would acquire the Tennessee restaurant and operate out of Tennessee). (Randall Dec. at Page ID 362). In late 2019, Viridis FSM obtained a loan from Franklin. (Lefkowitz Decl. at 6).

On December 16, 2019, Viridis FSM executed and delivered to Franklin a Promissory Note evidencing a loan in the original principal amount of $500,000 ("Note"). (Note, ECF No. 24-3). Franklin and Defendants executed a letter agreement dated December 16, 2019 ("Letter Agreement"). (Letter, ECF No. 24-4). In the letter agreement, the parties agreed to the following:

> A portion of the Term Loan in an aggregate principal amount equal to **$271,428.38 shall be disbursed into a cash collateral account in the name of Lender** (or such other Person as directed by Lender) (the "Cash Collateral Account). Company hereby authorizes Lender to apply up to $71,428.38 of such amount to the regularly scheduled payments due in respect of the Term Note and the Consulting Engagement on January 1, 2020, February 1, 2020, and March 1, 2020. **The remaining $200,000 in the Cash Collateral Account may be used by Company to finance acquisitions approved by Lender in its sole discretion**, or for such other purposes as may be approved by Lender from time to time in its sole discretion.

(Letter at 13, emphasis added). The parties also agreed that Viridis FSM must, among other things:

> (m) (i) **Maintain all of its bank accounts with a bank that has entered into a control agreement with Lender** with respect to such accounts in form and substance satisfactory to Lender and (ii) permit Lender to have 'view access' to each of its bank accounts.

3

(Letter at 9, emphasis added). In the Note, the parties defined an "Event of Default" to include,

> (c) Borrower shall fail to observe or perform any other condition, covenant or agreement of Borrower set forth in this Note or in any other Loan Document, or … (m) the occurrence of any event (including any change, for any reason whatsoever, in the management, ownership or control of Borrower) which Lender determines, in its sole discretion and judgment, would have a material adverse effect upon Borrower and/or its ability to pay or perform any of its liabilities or obligations under this Note …

(Note at 2-3). The Letter Agreement defined "material adverse effect" as:

> [A] material, adverse effect on (i) the business, property or condition (financial or otherwise) of Company, any subsidiary of Company or any Guarantor; (ii) Company's, any subsidiary's or any Guarantor's ability to perform its obligations hereunder or any other Loan Document to which it is a party, or (iii) the validity or enforceability of this Agreement or any other Loan Document.

(Letter at 2). Upon the occurrence of any Event of Default, Franklin had the right to deem the entire outstanding indebtedness due and payable, including attorney fees and costs, and may proceed to protect and enforce its rights and remedies under the loan agreements. (Note at 5).

In the Letter Agreement, Viridis FSM waived:

"any rights to assert against [Franklin], any defense (legal or equitable), set-off, counterclaim, or claim which [Viridis FSM] may now or at any time hereafter have against [Franklin] or any party liable to [Franklin] or that may arise, directly or indirectly from the present or future lack of perfection, sufficiency, validity, or enforceability of the Liabilities or ay security therefore."

(Letter at 14).

As security for Viridis FSM's indebtedness to Franklin, Viridis Foods, Hot Box, and Randall executed and delivered to Franklin a Continuing Guaranty dated December 16, 2019 ("Guaranty"), in which they guaranteed payment to Franklin of all of Viridis FSM's outstanding indebtedness to Franklin, including attorney fees. (Pl's St. at 4-5). Franklin perfected its security

4

interest under a UCC-1 financing statement and has a first priority interest in the assets pledged in the Security Agreement. (Pl's St. at 5).

As part of the agreement, Franklin required Defendants to hire one of their financial consultants, Jeff Cohen. (Randall Dec. ECF No 26-2 at PageID 364). At the time of the loan closing in December 2019, Hot Box had two bank accounts with Sun Trust. (Randall Dec. ECF No. 26-2 at PageID 367). In accordance with the loan agreements, Franklin required those accounts be transferred to a bank account at Level One, which it controlled. (Randall Dec. at PageID 367). Franklin also wanted Defendant's financial information in QuickBooks where they could see it. (Randall Dec. at PageID 367). Randall testified that he never opposed these conditions and

> began the process of transitioning the bank accounts to Level One and the financial information to QuickBooks. In the interim, we provided Jeff Cohen – Franklin's designated financial consultant who relayed everything to Franklin – with access to all our books and records including our banking information.

(Randall Dec. at PageID 368).

From the time of the loan closing in December 2019 and the beginning of February 2020, Randall grew frustrated with Franklin. (Randall Dec. at PageID 365-366). It appears that he believed that he was entitled to the entire $500,000 at the time the loan was executed. Randall testified, "I did not know where all of the $500,000 in loan proceeds had been disbursed. I only knew that Defendants did not have possession of it." (Randall Dec. at Page ID 365-366). Randall did not know whether Franklin was charging interest on the full $500,000 or only the $228,571.63 that had been disbursed. (Randall Dec. at PageID 365-366).

In January 2020, Randall identified a restaurant that he wanted to purchase in Nashville. (Pl's St. at 5-6). Two Franklin representatives flew to Nashville to view the restaurant location,

5

and later advised Randall that he could proceed with trying to negotiate the purchase of the restaurant, subject to Franklin's final approval in accordance with the Letter Agreement. (Pl's St. at 6).

In January 2020, Randall informed Franklin that Hot Box had terminated its contract with one of its customers in California, Specialized Bicycle Components, Inc. (Pl's St. at 6). According to the director of Franklin, Barry Lefkowitz, that customer had accounted for approximately 90% of Hot Box's monthly sales. (Lefkowitz Dec. ECF No 24-2 PageID 217; 2019 Report ECF No 24-8 PageID 285; 2020 Report ECF No 24-9 PageID 291). As to why he terminated the account, Randall testified,

> While Specialized Bicycle made a large monthly payment (approximately $70,000), the majority of that money went to third parties for food and labor needed to service the account. As a result, the gross monthly profit on the account was just $18,000 from which Hot Box then had to pay administrative costs (overhead, rent, utilities, insurance, ect.). It was Hot Box's least profitable account and occupied a large amount of time to service. Hot Box generated more than $30,000 in gross monthly profits from other accounts.
>
> In January 2020, and in anticipation of closing on the purchase of a Tennessee restaurant and expanding my catering operations in Nashville, I terminated the Specialized Bicycle account. I made this decision as an investment in the future – Specialized Bicycle was the least profitable account and occupied a disproportionate amount of the company's time to service . . . .

(Randall Dec. ECF No 26-2 at PageID 363-364). Randall testified that when he notified the financial consultant that he terminated the account, that the consultant "did not object or raise any concerns and agreed that in the long run my company overall would be more profitable without it." (Randall Dec. at PageID 365).

6

On February 20, 2020, after learning that Hot Box had issued a reimbursement check to me for $1,200, Lefkowitz emailed Randall notifying him that he needed to sign a forbearance agreement:

> Sean
>
> What is going on.
> This check was written after our conversation.
>
> I'm extremely disappointed as it directly is contrary to all the conditions and issues we discussed and how we would proceed going forward.
>
> I have tried to call you twice since to discuss and you haven't answered my calls. If this is how we are going to proceed , you're leaving me with little opportunity to work with you.
>
> I will be forwarding a forbearance agreement to you shortly.
>
> If it isn't signed and returned by the close of business tomorrow, you will leave me no choice but to proceed with legal proceedings to collect our note.
>
> I have tried to work with you to assist to see your business grow and succeed, but your recent actions have been very disappointing.
>
> Please contact me as soon as possible.
>
> Barry

(ECF No. 26-9). Prior to receiving this ultimatum, Franklin "had not raised concerns to [Randall] about [his] termination of the Specialized Bicycle account or the slow transfer of [his] Sun Trust accounts to bank accounts that they controlled." (Randall Dec. at PageID 366).

Randall reached an agreement with the restaurant's lawyers that required $115,000 of the loan proceeds from Franklin to fund the purchase price. (Randall Dec. at PageID 366). Randall presented Franklin with a copy of the asset purchase agreement, along with a pro forma that

7

demonstrated the anticipated profitability of the restaurant, and he sought release of the $115,000. (Randall Dec. at PageID 367).

Franklin's director, Barry Lefkowitz, considered the termination of the Specialized Bicycle contract to be a material adverse effect on the business and queried how Viridis FSM and its related entities would have funds to support the new proposed venture in Nashville without revenue from its existing businesses. (Lefkowitz Dec. at PageID 217).

Franklin offered to consider the potential purchase of the Nashville restaurant if Viridis FSM would agree to the Forbearance Agreement, which contained certain amendments to the loan agreements and to provide additional security to account for the added risk in funding the purchase of a new business without significant revenue from the old business. (Lefkowitz Dec. at PageID 217-218). The additional security requested included monthly reports, complete access to Viridis FSM's bank accounts and QuickBooks. (Lefkowitz Dec. at PageID 217-218). Franklin also requested that Viridis FSM execute a confession of judgment to be held in the event of a future default on the loan. (Lefkowitz Dec. at PageID 217-218). Franklin also offered a short-term deferment of Viridis FSM's loan payments to allow it additional time to generate revenue from its new businesses to make monthly payments. (Lefkowitz Dec. at PageID 218). It also required that Randall agree to a $2,000 monthly cap on his compensation. (Randall Dec. at PageID 368). Viridis FSM did not accept Franklin's proposal. (Pl's St. at 6).

The parties' relationship continued to breakdown. Lefkowitz testified that:

> Virdi FSM refused to work with Franklin to resolve the issues that had arisen as a result of terminating a major source of revenue, including refusing to provide Franklin with access to its bank accounts so Franklin could have a transparent picture of the financial position and refusing to provide Franklin with additional loan security. As a result, Franklin

8

>declared Viridis FSM and its related entities in default of the Note and Letter Agreement.

(Lefkowitz Dec. at PageID 218). Randall testified that Franklin continued to demand that he sign the forbearance agreement as a condition for releasing the loan proceeds to acquire the restaurant. Randall testified,

> Barry Lefkowicz, Franklin's account representative, told me at one point that if I didn't return their money he was going to come down there and "f--- me up". In response, I continued to question what happened with all of the loan proceeds, why all of the $500,000 had not been released, whether Defendants were incurring 22% per annum interest on the full $500,000 despite not having access to the money . . . .

(Randall Dec. at PageID 369).

On March 12, 2020, Randall notified Franklin that Hot Box had secured a new catering opportunity in San Jose, California, which would replace and exceed the Specialized Bike account revenue. (Randall Dec. at PageID 369).

On March 13, 2020, Franklin notified Randall that it viewed termination of the Specialized Bike account and not operating out of a bank account at Level One as breached of the loan documents. (Randall Dec. at PageID 369). Two days later, Franklin declared that Defendants were in default of the loan based on these two issues, and Franklin notified Randall that they had applied $231,118.91 of the undisbursed loan proceeds against the loan balance. (Randall Dec. at PageID 369). Franklin commenced this action on March 16, 2020. (Compl. ECF No. 1).

## STANDARD OF REVIEW

Summary judgment will be granted where there exists no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue of material fact

exists where "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elect. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "The mere existence of a scintilla of evidence in support of the [non-moving party]'s position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. The Court "must view the evidence, all facts, and any inferences that may be drawn from the facts in the light most favorable to the non-moving party." *Skousen v. Brighton High Sch.*, 305 F.3d 520, 526 (6th Cir. 2002).

## ANALYSIS

The loan agreements state that they shall be construed in accordance with the laws of the State of Michigan. (ECF No. 24-3 at PageID 225; ECF No. 24-4 at PageID 243; ECF No. 24-5 at PageID 253). Therefore, this Court will apply Michigan law to these claims.

**I. Liability**

Resolution of Plaintiff's breach of contract claim and Defendants' breach of contract counterclaim requires the Court to construe the Note and Letter Agreement. First, in order to establish a breach of contract claim, "a plaintiff must establish both the elements of a contract and the breach of it." *RSM Richter, Inc. v. Behr America, Inc.*, 781 F.Supp.2d 511, 517 (E.D. Mich. 2011) (citing *Pawlak v. Redox Corp.*, 182 Mich. App. 758, 765 (1990)).

> The essential elements of a valid contract are: (1) parties competent to contract, (2) a proper subject matter, (3) a legal consideration, (4) mutuality of agreement, and (5) mutuality of obligation. Once the plaintiff establishes the elements of a contract, it must then establish that the contract was breached and damages resulting from the breach. Where performance is due under a contract, nonperformance constitutes a breach.

*Ordo City Hawtai Autobody Co., Ltd. v. Dimond Rigging Co. LLC*, 2015 WL 4966883 at *10 (E.D. Mich. 2015) (citing *Pawlak*, 182 Mich. App. at 765). The validity of the written contracts between the parties appears to be undisputed.

"Under Michigan law, when construing a contract or one of its provisions, the intentions of the parties govern." *First Nat. Bank of Ypsilanti v. Redford Chevrolet Co.*, 270 Mich. 116, 121 (1935)). "To ascertain the parties' intentions, the Court looks first to the language in the written agreement." *Ordo*, 2015 WL 4966883 at *10 (citing *Haywood v. Fowler*, 190 Mich.App. 253, 258 (1991)). Intent should be discerned "in light of the surrounding circumstances and from a reading of the instrument as a whole." *DaimlerChrysler Motors, L.L.C. v. Bill Davis Racing, Inc.*, 408 F.Supp.2d 337, 345 (E.D. Mich. 2005) (citing *Cleveland v. Detroit Trust Co.*, 264 Mich. 253, 257 (1933)).

A clear and unambiguous contract must be construed "as a matter of law and enforced as written unless contrary to public policy." *Id*. (citing *Quality Prods. and Concepts Co. v. Nagel Precision, Inc.*, 469 Mich. 362, 375 (2003)). "Contractual language is construed according to its plain and ordinary meaning, and technical or constrained constructions are to be avoided." *Id*. (citation omitted).

"Where the language of the writing is not ambiguous the construction is a question of law for the court on a consideration of the entire instrument." *Ordos*, 2015 WL 4966883 at *10 (quoting *In re Landwehr's Estate*, 286 Mich. 698, 702 (1938)). On the other hand, "[a]mbiguous contracts generally present questions of fact for trial." *Wells Fargo Bank, NA v. MPC Investors*, 705 F.Supp.2d 728, 736 (citing *Klapp v. United Ins. Group Agency, Inc.*, 468 Mich. 459, 469 (2003)).

Franklin argues that it is entitled to summary judgment as to liability on its complaint based on the unambiguous terms of the parties' loan agreements. (Pl's Br. at 13).

In the loan documents, the parties agreed that "$271,428.38 shall be disbursed into a cash collateral account in the name of the Lender . . . The remaining $200,000 in the Cash Collateral Account may be used by Company to finance acquisitions approved by Lender in its sole discretion." (Letter at 13). This language makes clear that the parties agreed that a portion of the loan proceeds could be used by Viridis FSM later to expand its business but only with Franklin's approval. As part of the conditions of the loan, the parties agreed that Virids FSM would "[m]aintain all of its bank accounts with a bank that has entered into a control agreement with Lender with respect to such accounts in form and substance satisfactory to Lender . . . ." (Letter at 9). Failing to do so would constitute an Event of Default under the loan agreements. (Letter at 9). Upon the occurrence of any Event of Default, Franklin had the right to deem the entire outstanding indebtedness due and payable, including attorney fees and costs, and may proceed to protect and enforce its rights and remedies under the loan agreements. (Note at 5).

Defendants argue that there was no material breach or default of the provisions of the loan justifying acceleration of the debt. (Def's Br. at 12). "In determining whether a breach is material, the court should consider whether the nonbreaching party obtained the benefit it reasonably expected to receive." *Omnicom of Michigan v. Giannetti Inv. Co.,* 221 Mich. App. 341, 348 (1997) (citing *Holtzlander v. Brownell,* 182 Mich. App. 716, 721 (1990)). "Other considerations include the extent to which the injured party may be adequately compensated for damages for lack of complete performance, the extent to which the breaching party has partly performed, the comparative hardship on the breaching party in terminating the contract, the

12

wilfulness of the breaching party's conduct, and the greater or lesser uncertainty that the party failing to perform will perform the remainder of the contract." *Id.* (citing *Walker & Co. v. Harrison,* 347 Mich. 630, 635 (1957)).

Defendant points to the following evidence to argue that the breach(es) were immaterial (1) the loan was only executory for 90 days prior to Franklin declared Defendants in default; (2) Defendants did not miss any payments; (3) Franklin did not give Defendants notice of the breach(es) prior to declaring Defendants in default. (Def's Br. at 14). However, the parties defined an Event of Default to include if Viridis FSM "shall fail to observe or perform any other condition, covenant or agreement of Borrower set forth in this Note or any other Loan Document." (Note at 2-3). As stated above, one of those conditions was maintaining its bank accounts with a bank that had an agreement with Franklin and where Franklin had viewing access. (Letter at 9). Randall testified that he had "began the process" of transitioning his accounts and was providing Franklin's financial consultant with access to his accounts in the interim. (Randall Dec. at PageID 368). However, it is unclear from the record what Randall means by "began the process" because Defendants do not deny that they were in breach. (Def's Br. at 14). Defendants only argument is that the breach was not material, (Def's Br. at 14) despite their mutually agreed upon definition of what would constitute a breach through an "Event of Default." (Note at 2-3).

An Event of Default also occurs under the loan agreements when an event occurs "which Lender determines, in **its sole discretion and judgment**, would have a material adverse effect upon Borrower and/or its ability to pay or perform any of its liabilities or

13

obligations under this Note." (Note at 2-3, emphasis added). The Letter Agreement further defined "material adverse effect" as:

> [A] material, adverse effect on (i) the business, property or condition (financial or otherwise) of Company, any subsidiary of Company or any Guarantor; (ii) Company's, any subsidiary's or any Guarantor's ability to perform its obligations hereunder or any other Loan Document to which it is a party, or (iii) the validity or enforceability of this Agreement or any other Loan Document.

(Letter at 2). Franklin considered the termination of the Specialized Bicycle contract to be a material adverse effect on the business and queried how Viridis FSM and its related entities would have funds to support the new proposed venture in Nashville without revenue from its existing businesses. (Lefkowitz Dec. at PageID 217). Again, Defendants do not deny they were in breach here, only that the breach was immaterial. (Def's Br. at 14). However, the language of the contract that Defendants agreed to is clear: Franklin had the sole discretion and judgment to determine what constituted a material adverse effect, which would constitute an Event of Default.

The Court must enforce a clear and unambiguous contract as written unless it contradicts with public policy. *Quality Prods. and Concepts Co*, 469 Mich. at 375. The parties agreed to what would constitute a material breach of contract by defining an Event of Default. First, Defendants were in breach because even though Randall may have started the process of transferring his bank accounts to a Franklin-approved bank, Defendants do not deny that 90 days from the execution of the loan agreements, the accounts had not been transferred. (Def's Br. at 14). Second, Defendants were in breach because Franklin considered the termination of the Specialized Bicycle account a material adverse effect on the business.

14

Defendants argument that Franklin violated the general duty of good faith is misplaced as "Michigan does not recognize a cause of action for breach of the implied covenant of good faith and fair dealing." *Fodale v. Waste Mgmt. of Michigan, Inc.*, 271 Mich. App. 11, 35 (2006).

In the loan agreements Defendants waived "any defense (legal or equitable), set-off, counterclaim, or claim" regarding "enforceability of the Liabilities or any security therefor." (Letter at PageID 243). Similarly, in executing the Guaranty, Defendants agreed:

> The Guarantor unconditionally and irrevocably waives each and every defense and setoff of any nature which, under principles of guaranty or otherwise, would operate to impair or diminish in any way the obligation of the Guarantor under this Guaranty, and acknowledges that each such waiver is by this reference incorporated into each security agreement, collateral assignment, pledge and/or other document from the Guarantor now or later securing this Guaranty and/or the Liabilities, and acknowledges that as of the date of this Guaranty no such defense or setoff exists. The Guarantor acknowledges that the effectiveness of this Guaranty is subject to no conditions of any kind.

(Guaranty ECF No 24-5 PageID 251). Courts in Michigan have enforced agreements that contain such waivers of defenses. See *Flagstar Bank v. Dilorenzo*, unpublished per curiam opinion, issued July 6, 2010 (Docket No. 289856), 2010 WL 2680122, *3-6. Defendants have not addressed the waivers in their brief. "Absent any support for an argument otherwise, then the waivers stand." *Id*. at 6.

For the above reasons, the Court GRANTS Franklin's motion for summary judgment as to liability for its Complaint.

**II. Counter-Claim**

In the counter-complaint, Viridis FSM alleges that Franklin breached their contract by not releasing the funds necessary for Viridis FSM to acquire the restaurant. (Counter-Compl. ECF No. 10 at PageID 105). Franklin correctly argues that this is not a breach of contract

15

because the express terms of the loan agreements provide that the funds were only to be provided if Franklin, in its sole discretion, approved of the acquisition. (Pl's Br. at 16-17; Letter at 13). As stated above, the plain language of the contract states that "$271,428.38 shall be disbursed into a cash collateral account in the name of the Lender . . . The remaining $200,000 in the Cash Collateral Account may be used by Company to finance acquisitions approved by Lender in its sole discretion." (Letter at 13). This language makes clear that the parties agreed that a portion of the loan proceeds could be used by Viridis FSM later to expand its business but only with Franklin's approval. Franklin did not give its approval to purchase the Nashville restaurant, and therefore Defendants' breach of contract claim is unfounded.

For the above reasons, the Court GRANTS Franklin's motion as to the Counter-Complaint and dismisses it with prejudice.

### III. Damages

Franklin argues that it is entitled to summary judgment as to damages. Defendants did not sufficiently address damages in their brief. In Franklin's brief, it argues:

> Franklin already has applied $231,118.91 to the outstanding principal balance of Viridis FSM's $500,000 loan. *See* Exhibit A at ¶ 21. Taking those funds into account, as of September 30, 2020, the outstanding indebtedness under the Note, excluding attorney fees, expenses and costs, included $262,808.51 in outstanding principal and $31,960.43 in accrued and unpaid interest. *Id*. In addition, Franklin has occurred attorney fees and expenses to date in total amount of $20,113.98. *See* Exhibit J. The attorney fees consist of 53.7 hours of professional work at the average hourly billable rate of $351.63. *Id*. These fees were incurred in Franklin's attempts to recover the Indebtedness. *Id*. . . . Defendants cannot dispute that they owe the total outstanding Indebtedness amount of $314,882.92 to Franklin.

(Pl's Br. at 19-20).

The Court concludes there is an issue of fact as to the amount of damages such that a ruling as to damages cannot be determined.

16

## CONCLUSION

For the reasons explained above, the Court GRANTS in part Franklin's motion for summary judgment as to liability for its Complaint and dismisses the Counter-Complaint with prejudice.

IT IS SO ORDERED.

s/Sean F. Cox
Sean F. Cox
United States District Judge

Dated: February 4, 2021